PEOPLE v KOEHLER

OPINION OF THE COURT

1. DRUGS AND NARCOTICS—EVIDENCE—CHEMICAL ANALYSIS—DISCRE-
TION.

Admitting into evidence in a criminal trial three unanalyzed
tablets allegedly containing LSD was not an abuse of discretion
where a police officer testified that he had purchased from the
defendant four purple tablets said by defendant to be LSD, and
where the prosecution's expert witness testified that he had
scientifically analyzed one of the four purple tablets given him
for analysis, that his analysis conclusively demonstrated the
presence of LSD in the tablet tested, and that the remaining
tablets appeared to be physically identical with the one tablet
analyzed; the defendant's objection with respect to the three
unanalyzed tablets is more properly addressed to their proba-
tive value than to their admissibility.

2. DRUGS AND NARCOTICS—SALE OR DELIVERY—EVIDENCE—USABLE
AMOUNT.

It is not incumbent upon the prosecution to prove that a defend-
ant charged with sale or delivery of narcotics delivered a usable
amount of narcotics.

3. DRUGS AND NARCOTICS—EVIDENCE—OTHER OFFENSES—ADMISSIBIL-
ITY.

Introduction of testimony concerning a police officer's attempted
purchase of PCP, an illegal narcotic drug, from a defendant
charged with delivery of heroin and LSD was not reversible
error where the testimony was arguably admissible to show the
defendant's scheme, plan, or intent as a dealer in illegal

REFERENCES FOR POINTS IN HEADNOTES
[1] 25 Am Jur 2d, Drugs and Narcotics § 44 et seq.
[2] 25 Am Jur 2d, Drugs and Narcotics §§ 20–22.
[3] 25 Am Jur 2d, Drugs and Narcotics §§ 46, 47.
[4] 21 Am Jur 2d, Criminal Law §§ 143–145.
Entrapment to commit bribery or offer to bribe. 69 ALR2d 1397.
[5] 41 Am Jur 2d, Indictment and Information §§ 56, 60.
[6–8] 58 Am Jur, Witnesses § 3; 29 Am Jur 2d, Evidence § 708 et seq.

narcotic drugs, the conversation the defendant had with the officer regarding PCP constituted a vital portion of the res gestae of the crimes charged, the prosecution was entitled to show that the defendant was in fact a drug dealer willing to sell to anyone he could without getting into trouble with the police because defendant's defense consisted of an allegation of entrapment, and where the admission of the testimony with respect to PCP could not have prejudiced the defendant in light of his admission that he sold heroin and LSD to the officer (MCLA 768.27).

4. CRIMINAL LAW—DEFENSES—ENTRAPMENT—OBJECTIVE TEST—RETROACTIVITY.

The Michigan Supreme Court decision which adopted an objective standard with respect to the defense of entrapment is not retroactive.

5. INDICTMENT AND INFORMATION—WITNESSES—RES GESTAE WITNESSES—INDORSEMENT OF WITNESSES—PRODUCTION OF WITNESSES.

The prosecution has a clear duty to indorse the names of all res gestae witnesses upon the information and to produce them for examination at trial (MCLA 767.40).

6. CRIMINAL LAW—WITNESSES—RES GESTAE WITNESSES—PRODUCTION OF WITNESSES—EXCEPTIONS.

There are four well-recognized exceptions to the general rule requiring production of res gestae witnesses at trial: when the prosecution makes a showing of due diligence in attempting to produce the witness; when the testimony of the missing res gestae witness would be merely cumulative; when the res gestae witness was a participant in the crime; and when the identity of the res gestae witness is made known to the defendant during trial, or even before, and the defendant does not move for the indorsement or production of the witness.

7. CRIMINAL LAW—WITNESSES—RES GESTAE WITNESSES—PRODUCTION OF WITNESSES—MISCARRIAGE OF JUSTICE.

Failure of the prosecution to produce a res gestae witness at trial could have resulted in a miscarriage of justice where a key witness with respect to a crucial question of entrapment was not produced and where the defendant's only hope for acquittal rested on the defense of entrapment; the case must be remanded to the trial court for a hearing to determine whether the testimony of the res gestae witness would have been cumulative.

8. CRIMINAL LAW—WITNESSES—RES GESTAE WITNESSES—PRODUCTION
OF WITNESSES—MISCARRIAGE OF JUSTICE—CASE PRECEDENT—
PROSPECTIVE APPLICATION.

*A decision of the Michigan Supreme Court establishing a prece-
dent to remand cases where the nonproduction of res gestae
witnesses may have possibly resulted in a miscarriage of justice
is by its express terms prospective and does not apply to an
appeal filed prior to the decision's publication date.*

Appeal from Berrien, Julian Hughes, J. Submit-
ted Division 3 June 3, 1974, at Lansing. (Docket
No. 16756.) Decided August 12, 1974.

Michael D. Koehler was convicted of delivery of
heroin and delivery of LSD. Defendant appeals.
Remanded with instructions.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *John Smie-
tanka,* Prosecuting Attorney (Prosecuting Attor-
neys Appellate Service, *Howard C. Marderosian,*
Acting Director, of counsel), for the people.

*Judith K. Munger,* Assistant State Appellate
Defender, for defendant.

Before: McGREGOR, P. J., and R. B. BURNS and
O'HARA,* JJ.

McGREGOR, P. J. Defendant appeals as of right
his jury conviction, on October 26, 1972, of deliv-
ery of heroin, contrary to MCLA 335.341(1)(a);
MSA 18.1070(41)(1)(a), and delivery of LSD, con-
trary     to     MCLA     335.341(1)(b);     MSA
18.1070(41)(1)(b).

On July 20, 1972, a complaint and warrant were

_____

* Former Supreme Court Justice, sitting on the Court of Appeals by
assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

issued charging defendant with the two crimes; subsequent to his preliminary examination on August 1, 1972, defendant was bound over to circuit court for trial; and on August 21, 1972, an information was filed, charging defendant in Count I with delivery of heroin, and in Count II with delivery of LSD. Defendant was convicted by a jury of each count and, on December 4, 1972, was sentenced to 3 to 20 years imprisonment on Count I, and 3 to 7 years imprisonment on Count II.

At trial, the people's case opened with the testimony of Michigan State Police Officer Huston, who stated that, on May 24, 1972, he and a police informant, Janice Stevens, drove to defendant's residence in Berrien County, Michigan, where the witness spoke with defendant and stated he would like to purchase some heroin. According to Officer Huston, he and the defendant walked to the rear of an old car on defendant's premises and defendant opened the trunk, removed a small box therefrom, and exhibited to the witness four small paper packets, a quantity of small brown tablets, and a quantity of purple tablets. In response to Huston's query, defendant identified the purple tablets as LSD, described the brown tablets as PCP (Phencyclidine), and sold to the witness two paper packets allegedly containing heroin for $20 and four purple tablets allegedly composed of LSD for $4. The witness averred that there was no haggling between the parties concerning the price, that defendant identified the material in the paper packets as heroin and the purple tablets as LSD, and, as Officer Huston prepared to leave, asked him if he (Huston) had a "works".

During cross-examination, Huston stated that he met with Janice Stevens at approximately 10:30 a.m. on May 24, 1972, because she had previously

told him that she could introduce him to a person who was allegedly dealing in heroin. The witness denied that he had told Mrs. Stevens anything which would have led her to believe that he needed heroin. Huston and Mrs. Stevens stopped their vehicle at one point while Mrs. Stevens talked with a friend, Larry Johnson, and although the witness did not hear the conversation between Mrs. Stevens and Johnson, he related that it was his understanding that Mrs. Stevens had told Johnson that Huston had a brother who was a "junkie". This impression was based on the fact that Mrs. Stevens had earlier told Huston that, in order to ingratiate himself with the drug dealer, Huston would "have to have something to make them think you are cool", whereupon Huston told Mrs. Stevens, "Why don't you tell him I have got a brother that's a junkie?", although he did not tell her to tell Johnson that Huston's "brother" was with him in the area. The witness denied that he acted as though he were under the influence of drugs when talking with defendant preparatory to purchasing the narcotics. Huston stated that his automobile followed a vehicle which he was told was driven by Mr. Johnson, and which led the way to defendant's residence on the day in question. The witness described three purple tablets introduced into evidence at trial as identical in appearance with those he had purchased from defendant and which defendant had stated contained LSD.

Donald Collins, an employee of the Michigan Department of State Police Scientific Laboratory Unit, testified that the total weight of white powder in the two packets turned over to him for analysis amounted to approximately 0.1 gram, and averred that his laboratory analyses confirmed that each packet contained heroin.

Ralph Sochocki, an employee of the Michigan Department of Public Health Division of Crime Detection, testified that he had analyzed one of the four purple tablets which were turned over to him for inspection, and had conclusively established the presence of LSD in the tablet analyzed. Sochocki related that, although he had not analyzed the three other tablets, the one tablet which he had analyzed appeared to be physically identical to the remaining three tablets. On cross-examination, the following colloquy transpired:

"*Q.* Do you have any opinion as to the quality of that one packet, the one pill that you examined?

"*A.* I am going to base this on a chemical reactivity and my instrumental analysis, it reacted very well in the instrumental analysis indicating that it was above the average."

The defense initiated its case, based on the defense of entrapment, with the testimony of Larry Johnson, who stated that on the day in question he was working at a gasoline service station in St. Joseph, Michigan, when Officer Huston and Mrs. Stevens drove into the station, inquired where the defendant lived, and asked Johnson to show them defendant's residence because Mrs. Stevens wanted to get some "acid" from him. According to the witness, he then drove his vehicle to defendant's home while Huston and Mrs. Stevens followed in their own car, but returned to the service station upon finding that defendant was not then at home. The witness related that, before leaving the station, Mrs. Stevens had told him that Huston's brother was "strung out" and "needed some stuff", and averred that he cooperated with Huston and Mrs. Stevens because the latter was a close friend whom he

trusted. According to the witness, Huston and Mrs. Stevens returned to the gas station at approximately noon on May 24, and again asked him to take them to defendant's residence, whereupon he led the way in a car driven by Douglas Fast, while Huston and Mrs. Stevens followed in their own vehicle. This time defendant was at home and the witness told him that Mrs. Stevens wanted to "buy some stuff", whereupon Huston walked up and said he wanted to talk to defendant, at which point this witness turned around and walked away.

On cross-examination, Mr. Johnson testified that Mrs. Stevens had told him that Huston's brother was "all strung up" and stated that it was his understanding that Huston's brother was a "junkie".

Douglas Fast testified that at approximately noon on May 24, he drove Larry Johnson from the gas station to defendant's house while Huston and Mrs. Stevens followed in their own vehicle. Although the witness did not hear any conversation between defendant and Johnson or Huston, he stated that on the way to defendant's residence, Johnson had told him that they were driving there because Huston had a brother who "was in pretty bad shape and needed some stuff". On cross-examination, Fast reiterated his testimony regarding Johnson's conversation with him concerning Huston's brother.

Testifying in his own behalf, defendant related that on the day in question, Mrs. Stevens, Johnson, and Huston came to his house and, after conversation, Huston stated that he needed to buy some acid and that defendant agreed to sell him drugs because "I trusted him because I trusted the people who he was with". Defendant candidly

Opinion of the Court

admitted that he then escorted Huston to an automobile parked on defendant's premises, opened the trunk, showed Huston some drugs, told him which pills were LSD, and sold Huston four LSD tablets and two packets of heroin.

On cross-examination, defendant agreed that he remembered having had heroin and LSD in the trunk of his automobile and that he had sold some of these drugs to Huston on the day in question. The defendant acknowledged that he "probably" would have sold drugs to Mrs. Stevens and to Larry Johnson if they had wanted to buy them, whereupon the following colloquy ensued:

"*Q*. So the only people that you would sell to are the ones that you know well enough that you are pretty sure they wouldn't be a 'narc', wouldn't turn you in, is that right?

"*A*. Yes.

"*Q*. You were ready, willing and able to sell to anybody that you knew were *[sic]* safe, right?

"*A*. A person I trusted, yes."

Later, during cross-examination, the following exchange occurred:

"*Q*. Now, you heard your two friends, Larry Johnson and Douglas Fast talk about Bill's brother being strung out. I didn't hear you testify about that.

"*A*. I never heard about that.

"*Q*. You didn't hear about that?

"*A*. No, sir.

"*Q*. That wasn't the reason you sold them drugs because his brother was strung out then?

"*A*. No, Janice told me that he was from Chicago and that he needed it bad, is what she told me.

* * *

"*Q*. So you sold heroin and LSD to Bill because you thought it was safe to do so, right?

"*A*. Yah, I said that before."

Plaintiff·presented as a rebuttal witness Detective-Sergeant Paul Whitford, of the Michigan State Police, who testified that he had "trailed" Officer Huston in another automobile from 9 a.m. to 2 p.m. on May 24, 1972, and that, during his continuous surveillance of the officer during that period of time, Huston had never stopped at any gasoline station in the Benton Harbor or St. Joseph area, as claimed by Larry Johnson and Douglas Fast, in their earlier testimony.

During defense counsel's cross-examination of Detective Whitford, the following colloquy transpired:

"*Q.* Do you know where Janice Stevens is today?

"*A.* No, I do not.

"*Q.* You were in pretty close contact with her, weren't you?

"*A.* No, sir, I never was in that close of contact.

"*Q.* But you met with her at Howard Johnson's that morning?

"*A.* That is correct.

"*Q.* She came there voluntarily, isn't that correct?

"*A.* That is correct.

"*Q.* So you don't know where she's at today?

·"*A.* I do not.

"*Q.* She could also tell us that they never stopped at a gas station, is that correct?

"*A.* That is correct.

"*Q.* Or she could deny that too, couldn't she?

"*A.* Not if she were telling the truth, no.

"*Q.* But you don't know where she's at?

"*A.* No, I don't."

Redirect examination then proceeded as follows:

"*Q.* Do you know of any efforts that have been made to find out where she's at to secure her for a witness today?

"*A.* Yes, sir, I do.

"*Q.* What efforts are those?

"*A.* The Michigan State Police Post at the Benton Harbor Post and the Sheriff's office from this county, both have been notified and attempted to locate her and have been unable to do so."

During his closing argument, defense counsel stated:

"You know who Janice is. Now, she wasn't here today —and by the way, Mr. Whitford told you that the Michigan State Police and the Sheriff's office has been looking for her. Do you know who they have been looking for her for? Me. I requested her. They didn't request her. Why did I request her? Because, again, when the defense of entrapment came up it became critical that I show you that he went—that Huston tried to go there and couldn't do it."

Defendant was convicted of both counts by the jury and on December 4, 1972, was sentenced to serve 3 to 20 years in prison on Count I, and 3 to 7 years on Count II.

On appeal, defendant claims that the trial court abused its discretion by admitting into evidence the three unanalyzed tablets allegedly containing LSD.

We cannot agree. Officer Huston testified that he purchased four purple tablets from defendant, after defendant told him the tablets were LSD, and testified at trial that the three purple tablets introduced by the people appeared to be the same ones he had purchased from the defendant. The prosecution's expert witness testified that he had scientifically analyzed one of the four purple tablets given him for analysis and that his analyses conclusively demonstrated the presence of LSD in the tablet tested, and that, although he did not

chemically analyze the remaining three tablets, they appeared physically identical with the one tablet which he had analyzed. This testimony established an adequate factual foundation for introduction of the three purple tablets at trial. *Cf. People v Ortiz,* 32 Mich App 372; 188 NW2d 635 (1971); *People v Mason,* 29 Mich App 613; 185 NW2d 822 (1971); *People v Kelly,* 386 Mich 330; 192 NW2d 494 (1971). Defendant's objection with respect to the three unanalyzed tablets is more properly addressed to their probative value than to their admissibility.

Relying upon *People v Harrington,* 33 Mich App 548; 190 NW2d 343 (1971), *lv den,* 385 Mich 775 (1971), defendant argues that it was incumbent upon the prosecution to prove that the defendant had delivered a usable amount of heroin or LSD to Officer Huston. Defendant's reliance is misplaced. This Court has held that *Harrington,* a case involving the unlawful possession of narcotics, is inapplicable to a prosecution for sale or delivery of narcotics. *People v Gaffney,* 51 Mich App 526, 529; 215 NW2d 587, 589 (1974); See also *People v McCullough,* 51 Mich App 534, 536; 215 NW2d 774, 775–776 (1974).

Defendant next argues that the introduction of Officer Huston's testimony concerning his attempted purchase of PCP from defendant was reversible error because it tended to show the commission of a distinct criminal offense with which defendant was not charged.

Defendant's argument is not well taken for a number of reasons. First, it is arguable that the testimony regarding the PCP was admissible at trial to show defendant's scheme, plan, or intent as a dealer in illegal narcotic drugs. See MCLA 768.27; MSA 28.1050; *People v Jones,* 38 Mich App

512; 196 NW2d 817 (1972). Second, defendant's showing of the brown tablets to Officer Huston, his statement that these tablets were PCP, and his further remark that he could not sell any of these to Huston because he was holding them for another, constituted a vital portion of the res gestae of the crime and were properly put before the jury as an integral portion of the entire transaction. See *People v Behm*, 45 Mich App 614; 207 NW2d 200 (1973), and *People v Williams #2*, 45 Mich App 630; 207 NW2d 180 (1973). Third, the testimony regarding defendant's alleged possession of PCP was admissible with respect to the question of whether or not defendant had been entrapped under the subjective entrapment test existing in this jurisdiction at the time of trial in this case. Since defendant's defense at trial consisted of an allegation of entrapment, the prosecution was entitled to show that, far from being trapped, defendant was in fact a ready and willing drug dealer who possessed a veritable "drug supermarket" and was willing to sell to anyone he could without getting into trouble with the police. Finally, it is difficult to see how the admission of the testimony with respect to PCP in any way prejudiced the defendant in light of his admission that he had sold heroin and LSD to Officer Huston.

Defendant next contends that he was entrapped as a matter of law and that the trial court's instructions with respect to that question were prejudicial and reversibly erroneous.

Defendant's argument is predicated upon the recent decision of our Supreme Court in *People v Turner*, 390 Mich 7; 210 NW2d 336 (1973), in which an objective standard with respect to the defense of entrapment is adopted. However, this Court has refused to accord *Turner* retroactive

effect. *People v Gaines,* 53 Mich App 443; 220
NW2d 76 (1974). Under the then prevailing subjec-
tive test of entrapment, the trial court's instruc-
tions to the jury were not erroneous. Further,
there was sufficient evidence adduced at trial to
warrant a finding that the defendant was not
entrapped as a matter of law.

We come finally to defendant's most forceful and
persuasive argument: that his conviction must be
reversed because the prosecutor failed to endorse
the name of Janice Stevens on the information
and failed to produce her as a witness at the trial.

It will be recalled that Janice Stevens was the
police informant who initially indicated to Officer
Huston that she might be able to lead him to a
dope dealer, and who accompanied Huston in his
vehicle to defendant's home at the time of the
drug purchase, on May 24, 1972. Throughout the
trial, Mrs. Stevens *in absentia* played a central
role. Defense counsel, in his opening statement,
indicated that he planned to present as a witness
"possibly a young lady by the name of Janice
Stevens" and the trial judge at one point during
the trial stated:

"I don't see the problem here of the confidential
informant or anything else so far as Mrs. Stevens is
involved. Mrs. Stevens' name has been mentioned as a
possible witness in this case, which has also been testi-
fied here already. I don't see any problem there now as
far as she is concerned. Furthermore, I understand
there are some subpoenas out for her right now.

"*Mr. Black [assistant prosecutor]:* That is correct,
your Honor."

Defense counsel's reference during his closing
argument to Mrs. Stevens' absence at trial has
already been discussed above.

Defendant asserts, the testimony indicates, and

the people do not deny, that Mrs. Stevens was a res gestae witness. Furthermore, as the prosecutor concedes, Mrs. Stevens' name was never endorsed on the information in this case and she was never called by the people as a witness at trial. The people do not contend that the production of Mrs. Stevens at trial was excused by a showing of due diligence in attempting to secure her attendance. Instead, the people merely point out that defendant, although well aware of Mrs. Stevens' potential as a witness in this case, never moved to have her name endorsed on the information and never moved to have the prosecution produce her as a witness at trial. Therefore, say the people, the defendant is precluded from claiming error on appeal with respect to Mrs. Stevens' nonproduction.

The law in Michigan imposes a clear duty on the prosecution to endorse the names of all res gestae witnesses upon the information and to produce them for examination at trial. MCLA 767.40; MSA 28.980; *Hurd v People,* 25 Mich 405, 416 (1872). There are, however, four well-recognized exceptions to this general rule requiring production of res gestae witnesses at trial:

"(1) When the prosecution makes a showing of due diligence in attempting to produce the witness, *People v Gibson,* 253 Mich 476; 235 NW 225 (1931), and *People v Kern,* 6 Mich App 406; 149 NW2d 216 (1967);

"(2) When the testimony of the missing res gestae witness would be merely cumulative, 2 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 605, p 782;

"(3) When the res gestae witness was a participant in the crime, *People v Lyle Brown,* 37 Mich App 25; 194 NW2d 450 (1971);

"(4) When the identity of the res gestae witness is made known to the defendant during trial, or even before, and defendant does not move for the indorse-

ment or production of the witness, *People v Gibson,*
*supra; People v Rasmus,* 8 Mich App 239; 154 NW2d
590 (1967); *People v Love,* 18 Mich App 228; 171 NW2d
33 (1969); *People v Printess C Jackson,* 11 Mich App
727; 162 NW2d 163 (1968); *People v May,* 34 Mich App
130; 190 NW2d 739 (1971); *People v Fuston Thomas,* 36
Mich App 23; 193 NW2d 189 (1971); *People v Williams,*
42 Mich App 278; 201 NW2d 286 (1972)." *People v
Bennett,* 46 Mich App 598, 619–620; 208 NW2d 624
(1973).

In the present case, defense counsel failed for-
mally to move for Mrs. Stevens' endorsement or
production at trial. In light of the fact that he
obviously knew of her importance prior to trial, we
would normally hold that defendant is barred from
appellate relief by the fourth exception above
stated.

However, we cannot ignore the Michigan Su-
preme Court's recent decision in *People v Robin-
son,* 390 Mich 629; 213 NW2d 106 (1973), in which
Justice COLEMAN, writing on behalf of a unani-
mous Court, stated:

"There is but one issue. Is defendant denied a fair
trial when the prosecutor fails to indorse on the infor-
mation the name of a possible res gestae witness who
was, or should have been, known to him prior to trial
and when he fails to produce such witness at trial?

"Defendant says that the duty of the prosecutor to
indorse and produce all res gestae witnesses is an
essential ingredient of a fair trial. *Although no objec-
tion was raised during trial, failure of the prosecutor to
act is said to demand reversal.*

"The people reply by claiming that the record does
not show that the prosecution knew of the unindorsed
witness before trial. Even if they had, any testimony in
addition to that presented at trial would have been
cumulative. *The people also remind us that defendant's
trial counsel did not seek an adjournment or move that
the witness be indorsed or even mention his existence.*

"Of the approximately three dozen individuals named in the information, at the preliminary exam or during trial, only one was not accounted for at trial. It is the unexplained omission of this individual's name from the information and his nonproduction at trial that is the basis of defendant's claim in this Court.

\* \* \*

"During the trial, defendant's attorney on two occasions affirmatively waived the presence of certain witnesses. Three were unable to be brought into court despite the prosecution's diligent efforts. One witness was deceased. The doctor who pronounced Howard Wright's death and two police officers stationed at the hospital were waived. Two other patrolmen were waived as their testimony would have been cumulative. At no time was the presence of Eugene Smith formally waived or excused. *At no time did defendant's counsel seek to have Eugene Smith indorsed or produced.*

\* \* \*

"In order to prevent what might possibly be a useless new trial, but also *in order to avoid a possible miscarriage of justice,* we retain jurisdiction and remand to the trial court pursuant to GCR 1963, 865.1(5)." (Emphasis added.)

If ever there were a case where the prosecution's failure to produce a res gestae witness at trial could result in a "possible miscarriage of justice", this is it. Because defendant admitted delivery of heroin and LSD to Officer Huston, his only hope for acquittal rested on the defense of entrapment. Concerning that defense, what witness could be more vital than the informant who served as the liason between police and the defendant? Certainly Mrs. Stevens' testimony would have been crucial and perhaps decisive during the jury's deliberations with respect to the question of entrapment. If the Supreme Court remands because one of three dozen witnesses is not produced at trial, can we do less where the key witness with respect to the

crucial question of entrapment is not produced? We think not.

In accordance with *People v Robinson, supra,* and *People v James,* 51 Mich App 777, 784–785; 216 NW2d 473 (1974), we retain jurisdiction of this case and remand to the trial court for a hearing to determine whether or not Mrs. Stevens' testimony would have been cumulative. The trial judge shall require the prosecutor to produce Mrs. Stevens at a hearing within 45 days from the release of this opinion. Mrs. Stevens shall be examined regarding her knowledge of the crime of which the defendant was convicted. At the conclusion of the hearing, the trial judge shall either grant the defendant a new trial or shall, within ten days after the end of the hearing, state his reasons for denying defendant a new trial. The trial judge's findings and a transcript of the hearing shall be forwarded to this Court. Defendant may file a supplemental brief within 15 days after the trial court reaches its decision, and the people may file their brief within 15 days after receipt of defendant's brief. If Mrs. Stevens cannot be located, the prosecutor must "bear the consequences" of the same and defendant shall be granted a new trial. *People v King,* 50 Mich App 487, 491; 213 NW2d 597 (1973).

Remanded for further proceedings consistent with this opinion. We retain jurisdiction.

R. B. BURNS, J., concurred.

O'HARA, J. *(dissenting).* The opinion relied upon by my colleague to mandate remand is by its express terms prospective and limited to appeals filed after its date of publication (January 28, 1974). See *People v Robinson,* 390 Mich 629, 634; 213 NW2d 106, 109 (1973).

I find no error and vote to affirm the conviction.